I wonder if the attorneys would step up and identify themselves for the record. Good morning. My name is Pamela Rubio with the State Appellate Defender's Office on behalf of Morris Williams. Good morning. Good morning. My name is Jeremiah Davis. I'm here on behalf of the people of Illinois. And you've both argued in the appellate court before, right? I have. Oh, this is your first time here. Well, welcome to the appellate court, counsel. Thank you. You've been here before, though. You don't – he doesn't get handicap points, though, because he's – 15 minutes. 15 minutes for you. 15 minutes for you. And you may save off from your 15 any portion you wish for a response. I think you can safely assume that we've read your briefs and we're familiar with the facts of the case, okay? Before you start, let me ask you this. The photo array wasn't there. What other evidence is there of identification? Just the in-court identification of the witness. That was – there was no line-up identification. There was no show-up. It was the photo array exclusively and then later at trial. He testified at trial as to what he saw at the time of the incident when his car was being burgled. He did, but the details surrounding what he saw is – even though he said he wasn't far from the suspect. Well, he was cross-examined at trial, wasn't he? He was, and as – He called it the motion to suppress the identification. The witness was not, only the – only the Stroger hospital officer. Is there anything in the record that shows how long the victim had an opportunity to observe him? He didn't say. He said that a few words were exchanged and they were at the closest three feet from one another. And then – but the witness did say that he was anxious and fearful for his safety because the suspect was holding a screwdriver. So he turned around and ran away. And we would argue that that was not a good opportunity for him to see the suspect because his direction – Well, they actually had a conversation, didn't they, according to the record? Just a few words were exchanged? Well, they did, yes. Yes. I mean, they talked to each other. Yes. Okay. But even after that exchange, these – The victim said he was about three or four feet away from the defendant when they had this conversation. Correct. But even at that distance and even after that conversation, the witness gave a very vague description of the suspect and the details that he did provide. What was the description? I thought it was male black, about six feet tall. Wearing a polo shirt. Striped shirt. The stripes were going down vertically or something. Did he throw that in? He did. He said it was – he said it was a striped shirt, but it was going down. He said he was wearing a baseball cap, black baseball. The officer said that the dispatch was a black baseball cap, dark pants, about 5'11", although the officer changed his testimony about the height and said, I think, at 1.6 feet and then 6'1", and the striped shirt, but it was going down. He said it was a polo shirt. He didn't explain the suspect's age or weight, any kind of distinguishing characteristics of his face, like a scar or his – any kind of facial hair when, in fact, Mr. Williams was 52 years old, weighed 220 pounds, had a scar across his nose, and one of the pictures in the – in the record shows that he had a very light beard and mustache. Not only that, Mr. – the uncontroverted evidence at trial is that Mr. Williams wasn't wearing a black baseball hat or dark pants or carrying a dark bag. He was not holding anything. He was wearing light khaki pants, a tan straw hat. So the only – the only detail was the striped shirt. And the officer's recitation of the facts didn't explain what color the shirt or what brand the shirt. It was a short-sleeved shirt. It was June. He was standing on a platform that was – it was 9 p.m. It wasn't an – you know, he wasn't in an alley at 3 in the morning. So we'd say that the identification procedures here were highly suggestive in that, in addition to the – in that the – if you've seen the picture, the officer held up Mr. Williams' hand for the photo. That was the only identification. Well, we know about the hand. But it wasn't the only identification. He did later identify him in open court. Right, but the state can't prove that his – Well, how about just a minute? Just so we get the facts straight, when you say that the photo array was the only ID of the defendant, that's not correct. The only pretrial identification. Well, it makes a difference when you add that word. But we'd say that any identification made by this witness was – did not have an independent basis separate from this highly suggestive array photo. But, you know, again – Other than his in-court identification based on the actual confrontation with the defendant in the parking lot. Right, but some of the factors – I mean, are we allowed to ignore all of that simply because we find the photo array to be highly suggestive? No, not at all. Well, what's the solution then? Well, the first part of the test is whether the identification procedure is suggestive. And then the second part is to determine whether there was an independent basis for his identification. Let's get this left to the trial court here. Would you have a strong objection to an attenuation hearing on the identification? We would say that an attenuation hearing isn't necessary. It would be an alternative – the photo array was suggestive, and it should have been highly suggestive. And so suppress. Now, I guess I'm going to ask again. If we agree with that premise, should we as the reviewing court try to, you know, read from the record a finding that there was no independent basis? Or would that be best left to a trial judge to rehear – or rather hear for the first time, I should say, whether or not there's an independent basis? Well, an attenuation hearing – a remand for an attenuation hearing is usually necessary when the facts aren't flushed out about whether there was an independent basis. We'd argue here there were enough facts on the record – there are enough facts on the record for this court to determine that no independent basis has been established by the state after going through the factors of Neal v. Biggers. So we have to completely ignore the testimony of the victim at trial? No, not at all. The testimony – well, again, in my brief I explained that the defense counsel failed to reopen the motion to quash, arrest, and suppress evidence and the motion to suppress identification testimony once the witness at trial testified and once the officer's version of events changed dramatically at trial about what happened. And we argued that defense counsel was ineffective for failing to reopen that. However, the issue is preserved so that this court can review all the facts presented to all the circuit court judges in this case when reviewing this issue, reviewing both issues, because defense counsel filed a motion for new trial re-alleging this issue and also preserved the issue when the evidence was presented at trial by renewing the motion to exclude and objecting to the admission of the evidence. So our position is that you can review all of the evidence contained in the record to find that there was no independent basis for this witness's identification of Mr. Williams. As for the – given the corrupting effect of the suggestive array and the method by which the officer showed it, the state cannot prove that the identification was based solely on Mr. Hufano's memory of the incident. Again, the officer held up Mr. Williams' head to the camera. He wore a striped shirt matching the description of the offender, and the officer in fact told Mr. Hufano before showing him the array that they had a suspect in custody matching the description of the offender. He also failed to provide an advisory form as required by statute. In this case, there's no reason. The officers couldn't have conducted a live lineup, and expediency was not an issue. Given these details, it would be virtually impossible for a witness to later be able to recall or identify a person on a completely independent basis from this highly suggestive array. And for that reason we – So you're – okay, I think I understand your position. That because of the highly suggestive nature of the array, the way in which it was presented in a highly suggestive manner to the witness, and the witness's inability to recall certain details of the description of the offender at trial, and the non-matching portions of the description of the offender – Could I interrupt you? Of course. What do you propose, though? Now, this was a police force at Stroger Hospital, which you pointed out has since been disbanded, and the State of New Jersey are pointing that out to us. But what were they supposed to do? I mean, when you have a defendant or someone who's in custody, and they fight against this idea of having their picture taken for a lineup, what should they do? Do you think they should – Well, in this case, the officer had many other options besides – Name one. Using a prior booking photo. Using what? A prior booking photo. Why would they have that at Stroger? Well, there's no expediency here in this case. They thought they had their man. This is not like a show-up situation. They had already arrested him, and so there's no time pressure. They could have called the Chicago Police Department, which they eventually did, and they got involved in the case. The Chicago Police could have come in and helped them with a live lineup if they didn't have people to stand for a live lineup. They're in a busy medical district area with a hospital right across the street. Actually, I think in the same building. They could have called in people to do a live lineup. They could have called Chicago Police and said, hey, do you have a prior booking photo of Mr. Williams? And they certainly did. He had been arrested in the past. They also had a photo in the record. There's a different photo that they could have used that would have been less suggestive than the photo that they used here. They had that on the evening of the arrest? They had a photo. They took a photo of Mr. Williams looking down, and we would contend that that's less suggestive than the photo of the officer holding up his head for the reason that when assessing the suggestiveness of an identification procedure, the focus is on the activity of the police and how they allude to the witness that this is the man they suspect. In this case, if they had presented a photo of Mr. Williams just looking down, the witness would have thought he is refusing to cooperate, and that would have been on Mr. Williams. But in this case, it's on the police because they physically moved his head and took a picture so that that inferred to the witness that this was the suspect. They wouldn't have done that to a volunteer participant of a photo array. And it alluded to the witness that it was imperative that he see this man's face. Was there any testimony of how they got those other photos? They said that they spent I think maybe up to 10 minutes trying to get him to take some pictures, and one of the pictures they took right before they held up his head is of him looking down. So again, there were many other options the officer could have used if they had called Chicago Police a little earlier and had them get involved. They could have certainly done a live line-up. They could have done a less suggestive array procedure. And that is exactly why this is different than a situation where a suspect is refusing to cooperate in a live line-up setting because in a live line-up setting, the officers cannot control the activity of the suspect. In this case, and in all photo array cases, an officer can directly control the content of the array that they use. For those reasons, we'd ask that this court reverse Mr. Williams' conviction or in the alternative, reverse the remand for a new trial with the exclusion of this evidence or for an attenuation hearing. I'm prepared to argue the second issue if you'd like to hear it. I don't hear any great enthusiasm. No, I'm happy to argue it. I was prepared to argue it. We have your brief and we'll give you an opportunity to respond after we've heard from the State. Thank you, Counsel. Mr. Davis? It is Davis, right? Yes. Let me ask you a question right off the bat. Certainly. If the photo array is removed from here, what other basis of identification is there in the record of this case? If the photo array is suppressed, we absolutely have the victim's in-court testimony based on his clear and prolonged contact with the defendant at the time of the crime itself. Okay, this long contact. How long did he have this conversation with him? Well, it was long enough for him to walk to his car and have a conversation. No, no. My question is how long was the conversation? Is there anything in the record that tells us it was two minutes, one second, whatever? The victim doesn't state a specific time in his testimony. So we don't know. It could be a second. It could be a minute. It could be ten minutes. It would probably be more than a few seconds seeing as the conversation took place. And this was dark and there was no lights in the car on. Isn't that correct? There were not lights in the car. However, there were lights in the garage. The victim testified clearly that the garage was well lit. And he testified that he was ten feet away from the defendant when the defendant stepped out of the car. So he stepped into the light when there was a distance of ten feet in between them. At a distance of about three or four feet, they had the conversation where the victim asked, what are you doing in my car? Defendant responded, my friend told me to wait at this car. And then the victim said, no, that's my car. And one would assume maybe an awkward pause took place after that. But so basically it was long enough for that conversation to take place. And let me ask you this. After the conversation, how long was it before the defendant was apprehended on the platform? Before the defendant was apprehended? Before its time passed? There's not a specific time stated for the arrest. Wasn't it within an hour or so that this all took place? The identification was within an hour. So the arrest would have been sooner than that. So the officer arrived at the platform and saw the defendant within ten minutes of the victim going down to the police station and saying, someone broke into my car. But the man, the defendant in this case, was wearing a straw hat, not a baseball cap. And light pants instead of dark pants. That's correct. However, he was wearing the same vertical stripe short sleeve polo shirt that the victim described. Wasn't it described as a silk shirt? I don't recall if the victim described it as a silk shirt. No, but wasn't it actually a silk shirt? I believe it was a silk shirt that the defendant testified that he wore a silk shirt. So is it your contention he was a quick change artist and he changed his clothes somewhere within the hour? Certainly not. But the fact that the hat was a different color and the pants were a different color, I mean, those certainly go to the accuracy of the description, but I don't think they're dispositive of the accuracy of the conviction. He still described the height fairly accurately, described his race, and described the shirt. But he didn't describe the scar on the nose? He didn't describe age or weight. And the clothes definitely don't match altogether, do they? The clothes don't completely match. Well, there were no dark pants. There was no baseball cap. I mean, there was a straw hat and light pants. That's kind of different. It's different. However, he did still state that he was wearing a cap. And the shirt was fairly unique. The fact that the description really isn't very precise, and then when he is brought in for his show-up photo array, rather, I should say, does it make a difference that they've got their hands on his neck when they've got, like, this kind of vague description? Does it make any difference? Absolutely not. And the trial court found in the motion to suppress the identification that the array itself was not even unduly suggestive. Far more suggestive photo arrays have not satisfied that test. There have been situations where the defendant was wearing hospital bandages that were the result of injuries sustained during the arrest and wearing the same clothes. I don't know that bandages is any more suggestive than pushing his face up and having a hand around his neck with three other people. It certainly suggests something. They've argued it suggests pygmy. It's certainly odd and unusual to see this hand pushing the guy's face up and three other pictures. So I don't know what the hospital head garb, why that's more suggestive than, you know, pushing his hand up, having a hand on his neck. I don't know. I don't see the analogy. I think both of them set the defendant apart from the other people in the lineup or the photo array. But neither of those examples of how a defendant appears differently really suggests any wrongdoing on the part of the officers, any hanging of a pygmy sign around the defendant's neck. The officers had to hold the defendant's head up because the defendant would not look at the camera. If the defendant did not look at the camera, no one could make out his face from the photograph. All right. Well, let me ask you this. What about counsel's argument that there was no urgency here, that the Stroger police could have easily called over to the Chicago Police Department and they could have had a physical lineup instead of doing what they did, you know, choking him around the neck in the picture. I mean, what is your response to that, that there was no emergency because he was arrested already on the L platform? The officer testified that he arrested him and he recovered, you know, a radio, a car radio in a trash can nearby, and I think there was a screwdriver in that trash can. So what was the hurry? In any arrest situation, expediency is preferred because there is always that chance that maybe they arrested the wrong person and maybe the victim, once they identify someone else, can clear that out and get the person who was wrongly arrested on their way as soon as possible. I think any defendant, when they're arrested, would prefer the luxury of expediency over being held if they're the wrong person. An hour later getting out is what they'd prefer. Like, yeah, if it takes another hour or two to get me in a lineup and the guy doesn't finger me, I'd be much happier than having the photo arrayed. I mean, I understand that this defendant at the time was being a bit recalcitrant, shall we say, but I don't know that that then, you know, with three other photos. I mean, is that a message that we should give to the police, that it's appropriate to hold somebody by their neck in a photo array for identification purposes? I mean, is this an appropriate thing in your mind? Well, whether this was the right course of action, the right police conduct, that doesn't weigh on the issue of whether a photo array is admissible. Whether I would do this if I were a police officer, that doesn't weigh on the admissibility. Whether it's unduly suggestive and unnecessarily suggestive, that's what bears on the admissibility of the photo array. You don't think that that would convince somebody who had a glance at somebody to see a photo array with a police officer's hand around somebody's neck? You don't think that that's overly suggestive? I do not, Your Honor. And furthermore, there is a great deal of attention paid to the conduct of the officers, but the defendant has no one to blame for his appearance in the photo array but himself. The defendant constantly refused to look at the camera. This is very similar to People v. Yates, in which the defendant refused to cooperate in the lineup and drew attention to himself. The similarity is in the fact that both of these defendants were no strangers to the criminal justice system. This is the defendant's 11th conviction, his 4th conviction for burglary. This defendant knew what he was doing. He knew he was obstructing the investigation process. As long as you're on that subject of his background, did you notice what the sentence was in this case? The sentence in this case was 23 years. 23 years for stealing a car radio? Correct. Is that like the old loaf of bread? No, this was class X. He had to give him at least 6, didn't he? Correct. But he decided to give him 23. Where did that figure come from? Do you have any idea? Did the trial court make any mention of that in sentencing as to why he chose the 23? At length, Your Honor. He mentioned many, many things. And if you look at it solely from how he got to the sentence, he pretty much laid it out that this individual had multiple felony convictions. He had convictions for burglary. He had, I think, a possession of a controlled substance conviction. He had maybe a misdemeanor battery back in his past. He was 53 years old. The judge pointed out that he had a pretty decent family background. He pointed out that he had spent much of his adult life in prison. And that's all well and good. But at the same time, this person was sentenced to 23 years for breaking in a car and basically not taking the car but getting that radio. So, I mean, that's, I guess, what our question is. Yes, the judge set it all out, but 23 years for a car radio. Yes, it was 23 years for a car radio in addition to the other factors that you described. The nature of the charge is one factor in sentencing. It's a large factor. One could easily argue. But this is one stolen car radio that was part of basically a career of burglary. Did he have any convictions for weapons convictions at all? No, there were no weapons convictions. Any forcible felonies, armed robbery, anything like that? No, there were no forcible felonies. However, if the legislature intended that to be a- Well, they gave us a guideline, 6, 6 to 30. This was a screwdriver that he used. Yes, the guideline is 6 to 30. But if the sentence is within the guidelines, it's presumed to be reasonable. A sentence won't be set aside unless it's arbitrary or fanciful such that nobody else would agree, no reasonable person would agree with the sentence. I think it's reasonable to agree that after this defendant has been given break after break. No, you really can't, I can't go along with that one. I just can't go along with 23 is reasonable for a radio on a car. But go ahead. He stole the radio from the car while he was on parole for three consecutive counts of possession of controlled substance, which he received the break of one year. That other judge gave him a year on some drug case. Yes. Well, why didn't he get 23 for that then? I believe because of possession of controlled substance. We've got a judge just before this happened, the offense he was on parole for giving him a year, the minimum. Then he's eligible for a class X and he breaks into a car, takes the radio. At the age of 53. And he gets 23 years.  Yes, but the standard is whether no reasonable person would agree to the sentence. Well, I think that's what Justice McBride is suggesting, that in her view no reasonable person could come to the conclusion that 23 years was an appropriate sentence. I mean, it's almost a life sentence. It is a life sentence. But based on factors such as their demeanor, their potential for rehabilitation, it is a suitable sentence. This is a defendant who accepted no responsibility for his actions. When he was given the right to allocution before his sentencing, he spoke for two hours about, not about how he was going to rehabilitate himself when he would be released or how he was a good person and he should get something closer to six years than to 30 years. He spoke at length about how it was everybody else's fault, how it was ineffective assistance of counsel, how the officers didn't have probable cause, how the evidence didn't support arrest. This is... Well, maybe he's in denial. I mean, you know, that's not unusual for a criminal defense. But anyway, do you have a problem with an attenuation hearing? If we conclude that the lineup was suggested, is the appropriate path here to send this back for an attenuation hearing? Well, I don't believe that we would reach that point because the photo array was not unnecessarily suggested. The defendant didn't meet the burden of the hearing. I'm just giving you the idea that if we conclude it is, then what is the appropriate path? If you conclude that the photo array was unnecessarily suggested, yes, absolutely. An attenuation hearing is the appropriate relief, especially in this case where the judge spoke at length about how he observed the victim's demeanor when he identified the defendant in court. He's clearly describing something that the record doesn't capture entirely. And so there should be an attenuation hearing. The record isn't sufficient to determine whether or not there is an independent basis. Okay, thank you. And finally, going back to whether expediency was an issue, we did describe the defendant's interest in being released if they're the wrong person. But then there's also the objective of having a fresh identification. One of the factors in whether there's an independent basis is the length of time between the crime itself and the identification. So clearly a fresh identification is favored. The officers were trying to facilitate that by getting an identification as soon as possible. An in-person lineup wasn't feasible in this situation. The defendant didn't meet their burden of establishing that a photo array was feasible. This is a hospital. This is where people are either working... Does the defendant have a burden here? Yes, the defendant's initial burden is that of establishing that the photo array was unnecessarily suggestive. That burden is not met in this case. As stated before, there's talk of, you know, it's a busy area. They could have found other African-American males. But the question, keep in mind that this is a hospital and the police are working in an office in the hospital. This is where people like the victim are going to work. They're doctors and nurses. They're patients. They're visiting loved ones. They frankly just aren't going to stop at the request of the officers to volunteer to stand in a lineup. Based on these reasons and those stated in our brief, we respectfully request that you affirm the defendant's conviction and sentence. Thank you, Mr. Davis, and welcome to the appellate court. The state relies on the witness's in-court identification to say that it was not at all the product of the suggestive array. But in fact, as I explained, the witnesses, in addition to the witness's in-court identification being tainted by this highly suggestive array, he also admitted at trial that he saw Mr. Williams approach the bench after being called as a defendant in this case pre-trial. So that also tainted his in-court identification of Mr. Williams because he knows that he's the defendant. And he also said that after viewing the array and identifying Mr. Williams, he was shown the proceeds of the burglary, which reaffirmed his belief that that was the man that had committed the crime. So you would argue that given the taint involved in the photo array, there is no way that the in-court identification can be considered reliable. In other words, the state did not meet its burden of proof in this case. In this case, yes. We're not advocating for a remand. You're not talking about a remand. You're talking about an outright reversal. That's our preferred relief, yes. Not a new trial. Our number one preferred relief would be an outright reversal. Because if you eliminate the in-court identification because it's tainted by the photo array and you eliminate the photo array, what else does the state have? Nothing. No prints. They have no evidence found on Mr. Williams. Well, there's the radio. Right. Right. They could present that, but there's no connecting Mr. Williams to the radio. Well, he was in proximity to the radio when he was arrested. The radio was later identified by the victim as being his car radio, right? Correct. So that's all the state would have. Correct. They'd have Mr. Williams on a station platform. They'd have a bag with a radio in it. Right. And the radio came from the car. Right. We are also arguing that his arrest is- Of course. Oh, I know exactly what you're arguing. And basically what you're arguing for is an outright reversal that the state failed. If you eliminate the in-court identification and the photo ID, the state doesn't have anything. Correct. Okay. Alternatively, if you do believe that there's enough evidence to continue with the case, it could be remanded for a new trial with the exclusion of this evidence. I wouldn't want to prosecute that one, would you? As for the state's argument that this case is like line-up cases involving situations with bandages on their heads, again, that's not police activity. In fact, the appellate court has held that if there's a case where a person is wearing red pants and they say, well, that's not suggested because he was already wearing the red pants. But if the officer made him wear the red pants, that would be suggested. I'd say that that is closer to what we have here because we have actual police conduct that's highlighting the presence of the defendant in the array. So for the reasons stated today and those in my brief, I ask that the conviction of Mr. Williams be reversed. Counsels, thank you both. The case will be taken under advisement.